IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 17-0970

_____

**FILED**

**February 28, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

DONALD WOODS,
Petitioner

v.

JEFFERDS CORPORATION,
a West Virginia Corporation,
Respondent

_____

Appeal from the Circuit Court of Putnam County
The Honorable Joseph Reeder, Judge
Civil Action No. 15-C-34

AFFIRMED

_____

Submitted: January 30, 2019
Filed: February 28, 2019

Edward G. Atkins, Esq.                    Victor O. Cardwell, Esq.
Charleston, West Virginia                 Michael P. Gardner, Esq.
Counsel for the Petitioner                Woods Rogers, PLC
                                          Roanoke, Virginia
                                          Albert F. Sebok, Esq.
                                          Jackson Kelly, PLLC
                                          Charleston, West Virginia
                                          Counsel for the Respondent

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.       "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."  Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

2.       "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."  Syl. Pt. 4, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

3.       "In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq.* (1979), the plaintiff must offer proof of the following:

(1)      That the plaintiff is a member of a protected class.

(2)      That the employer made an adverse decision concerning the plaintiff.

(3)      But for the plaintiff's protected status, the adverse decision would not have been made."

Syl. Pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986).

4. "The 'but for' test of discriminatory motive in *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986), is merely a threshold inquiry, requiring only that a plaintiff show an inference of discrimination." Syl. Pt. 2, *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995).

5. "In order to establish a case of discriminatory discharge under *W.Va. Code*, 5-11-9 [1989], with regard to employment because of a [disability], the complainant must prove as a prima facie case that (1) he or she meets the definition of [having a 'disability'], (2) he or she is a '[qualified individual with a disability],' and (3) he or she was discharged from his or her job. The burden then shifts to the employer to rebut the complainant's prima facie case by presenting a legitimate nondiscriminatory reason for such person's discharge. If the employer meets this burden, the complainant must prove by a preponderance of the evidence that the employer's proffered reason was not a legitimate reason but a pretext for the discharge." Syl. Pt. 2, *Morris Mem'l Convalescent Nursing Home, Inc. v. W.Va. Human Rights Comm'n*, 189 W.Va. 314, 431 S.E.2d 353 (1993).

6. "A '[qualified individual with a disability]' under the West Virginia Human Rights Act and the accompanying regulations is one who is able and competent, *with reasonable accommodation,* to perform the essential functions of the job in question." Syl. Pt. 1, *Coffman v. W.Va. Bd. of Regents*, 182 W.Va. 73, 386 S.E.2d 1 (1988), *overruled on other grounds by Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 479 S.E.2d 561 (1996).

7.      "To state a claim for breach of the duty of reasonable accommodation under the West Virginia Human Rights Act, W.Va. Code, 5-11-9 (1992), a plaintiff must alleged the following elements: (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation."  Syl. Pt. 2, *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 479 S.E.2d 561 (1996).

8.      Under the West Virginia Human Rights Act, W.Va. Code § 5-11-9 [2016], an employer may rely upon the reasonable opinion of a medical expert when deciding if a disabled individual is medically qualified to perform the essential functions of a job.  A reasonable opinion is one made in good faith by an expert familiar with the individual, including the individual's work and medical history, and with the essential functional requirements of the job.

**HUTCHISON, Justice**:

Plaintiff Donald Woods brought this disability discrimination action pursuant to the West Virginia Human Rights Act, W.Va. Code §§ 5-11-1 to -20. He alleged that the defendant, Jefferds Corporation ("Jefferds"), refused to hire him because of his physical disability. Jefferds moved for summary judgment asserting it declined to hire Mr. Woods because a pre-employment physical examination revealed that Mr. Woods's disability prevented him from completing essential responsibilities of the job. Additionally, Jefferds argued that Mr. Woods neither asked for nor proposed any reasonable accommodation that would allow him to complete those essential tasks. Instead, Mr. Woods insisted upon an unreasonable course: that Jefferds disregard the results of the physical examination. The Circuit Court of Putnam County granted the motion for summary judgment and dismissed the action.

Mr. Woods now appeals the circuit court's summary judgment order. We affirm.

## I. Factual and Procedural Background

The respondent and defendant below is Jefferds Corporation, an equipment servicing company. Jefferds has employees permanently stationed within the Toyota manufacturing plant in Buffalo, West Virginia, who maintain and repair Toyota's assembly-line machinery, cranes, forklifts, and other equipment. Jefferds classifies each employee as an "engineering equipment mechanic," a physically demanding job that requires crouching, climbing ladders, lifting and carrying up to 75 pounds, crawling, and

1

otherwise contorting oneself into tight and precarious positions. Some equipment in the plant is located atop lifts that can be repaired or maintained only by climbing vertical ladders; other equipment is in below-ground "containment pits" where fluids build up and pumps are serviced. Four engineering equipment mechanics work on the day shift at the Toyota plant, and two work the night shift.

In late 2013, Jefferds advertised an opening for an engineering equipment mechanic at the Toyota plant on the night shift. The petitioner and plaintiff below, Donald Woods, responded to the advertisement and an in-person interview was arranged. In January 2014, Mr. Woods met with three Jefferds employees: the site supervisor at the Toyota plant, the company's human resources manager, and an operations manager. The parties agree that the interview went well.

During the interview, Mr. Woods told the Jefferds employees that he had a prosthetic leg. In 2003, Mr. Woods was involved in a motorcycle accident that resulted in the amputation of his left leg above the knee. Because of his prosthesis, Mr. Woods expressed two limitations on his work abilities: first, he said he had difficulty picking up and then walking while carrying a heavy object, and second, he said he could not wear a heavy, steel-toed boot on his prosthesis. After discussions, the Jefferds employees agreed that Mr. Woods could use a dolly to move heavy objects, and that he could wear a tennis shoe on his prosthetic leg. During the first interview, Mr. Woods was invited to complete a formal job application for Jefferds.

2

Several weeks later, a Jefferds supervisor contacted Mr. Woods and invited him back to the company's office. In this second meeting, the supervisor conditionally offered Mr. Woods the engineering equipment mechanic job. Mr. Woods later recalled that the supervisor told him "that I was perhaps, maybe, the best candidate that they had gotten so far." However, the Jefferds supervisor told Mr. Woods the offer was conditioned upon him successfully passing a pre-employment physical examination.[1] Jefferds scheduled and paid for the examination with an independent physician.

Jefferds supplied the physician with a "Jefferds Corporation Physical Examination" form to complete after seeing Mr. Woods. Jefferds also supplied the physician with a four-page document that outlined the physical skills required of an engineering equipment mechanic. Those skills included "stooping, bending, crouching, crawling," "climbing step ladders," "climbing stairs and ladders," "climbing 40' extension ladders," and "building and climbing scaffolding."

The physician saw Mr. Woods, completed the physical examination form, and returned it to Jefferds. On the form, the physician noted that Mr. Woods was wearing a prosthetic leg. Under the heading "Physician's Recommendations to the Prospective Employer," the physician declared that Mr. Woods was "unable to do jobs that require squatting or climbing ladders[.]" The physician also noted that Jefferds

---

[1] Jefferds also required Mr. Woods to complete a drug screen and a criminal background check.

should not give Mr. Woods a job that involved "excessive stooping, bending, & crouching."

Thereafter, employees of Jefferds contacted Mr. Woods and arranged a third, in-person meeting. At that meeting, the human resources director for Jefferds told Mr. Woods about the results of his physical examination. She told Mr. Woods that the physician had recommended Mr. Woods not be placed in a job that "require[s] squatting or climbing ladders[.]" Because these were essential tasks required of an engineering equipment mechanic, she said that Mr. Woods could not have the job.

Mr. Woods objected and told the Jefferds employees present that the doctor was wrong. He insisted that he could climb ladders and that he could partially squat, and offered to demonstrate that he could complete these skills. The Jefferds employees listened to Mr. Woods's entreaties, but maintained they were bound by the physician's assessment of his abilities. In later depositions of the three Jefferds employees who met with Mr. Woods, each employee stated that the decision not to hire Mr. Woods was based solely upon the physician's recommendation that Mr. Woods not be placed in a job requiring squatting or climbing ladders.[2]

---

[2] Somewhere over a month after his rejection by Jefferds, Mr. Woods sought out and paid for his own functional capacity examination in April 2014. Mr. Woods testified in his deposition that he wanted to be able to present the report of the examination to any future employer who might question his physical capabilities. The report stated, "[t]he purpose of this FCE [Functional Capacity Evaluation] was to evaluate Mr. Woods' current safe functional abilities to assist him in clarifying his

Continued . . .

On February 19, 2015, Mr. Woods filed the instant lawsuit against Jefferds in the Circuit Court of Putnam County, alleging that the company's refusal to hire him constituted disability discrimination in violation of the West Virginia Human Rights Act.[3] After the parties conducted discovery, Jefferds filed a motion for summary judgment asserting that Mr. Woods had failed to establish a prima facie case of discrimination.

In an order dated October 4, 2017, the circuit court granted summary judgment to Jefferds and dismissed Mr. Woods's disability discrimination claim. In order to establish his disability discrimination claim, the circuit court noted that Mr. Woods was required to offer proof that Jefferds acted with discriminatory intent and that Mr. Woods's disability actually motivated the employer's decision. The circuit court concluded that Jefferds could rebut any inference of discrimination because it articulated a legitimate, nondiscriminatory reason for their decision not to hire Mr. Woods: it did not hire him because an independent physician concluded Mr. Woods could not safely perform tasks essential to the job, namely squatting and climbing ladders. Mr. Woods offered no evidence that this reason was merely a pretext for discrimination.

_____

objectively measured safe functional abilities to potential employers." The report noted that Mr. Woods "demonstrated limited ability to squat/crouch," and that he "ascended and descended 5 rungs on an extension ladder x 5 repetitions[.]" It appears that Mr. Woods did not provide Jefferds with a copy of this report until after he filed the instant lawsuit.

[3] The second count of Mr. Woods's complaint asserted that Jefferds's actions caused an intentional infliction of emotional distress. Mr. Woods has since abandoned this count of his complaint.

Furthermore, the circuit court found that Mr. Woods had also failed to offer evidence that Jefferds did not reasonably accommodate his disability. Mr. Woods did not dispute that squatting and climbing ladders were essential functions of the job position, yet his pre-employment physical examination determined that he was unable to climb ladders and squat adequately. Mr. Woods merely sought the complete rejection of the physician's physical examination report. The circuit court concluded that, "Jefferds [was] fully entitled to rely on the conclusions of the physician who examined Mr. Woods and it has no obligation to defer to Mr. Woods'[s] non-medical opinions." The circuit court therefore rejected the claim that Jefferds failed to reasonably accommodate Mr. Woods's disability.

Mr. Woods now appeals the circuit court's summary judgment order.

## II. Standard of Review

Our standard for reviewing an order granting summary judgment is well settled. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). In conducting a de novo review, we apply the same standard for granting summary judgment that was applied by the circuit court. Under that standard,

> [a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133

S.E.2d 770 (1963). In other words,

> [s]ummary judgment is appropriate where the record taken as
> a whole could not lead a rational trier of fact to find for the
> nonmoving party, such as where the nonmoving party has
> failed to make a sufficient showing on an essential element of
> the case that it has the burden to prove.

Syl. Pt. 4, *Painter v. Peavy*, 192 W.Va. at 190, 451 S.E.2d at 756. "The circuit court's

function at the summary judgment stage is not to weigh the evidence and determine the

truth of the matter, but is to determine whether there is a genuine issue for trial." *Id.*, Syl.

Pt. 3.

### III. Discussion

Mr. Woods's assignments of error to the circuit court's summary judgment

order are not clearly stated, but they appear to present a challenge with two facets.[4] First,

Mr. Woods generally seems to argue that the circuit court erred when it found he had not

[4] Our confusion regarding petitioner Woods's arguments stems, in part, from his counsel's failure to comply with the Rules of Appellate Procedure. The opening part of petitioner's brief on appeal lists seven distinct assignments of error; however, the argument section of the brief melds these seven assignments into an indistinguishable mélange of assertions. Rule 10(c)(7) of the Rules of Appellate Procedure mandates an appellate brief "contain an argument exhibiting clearly the points of fact and law . . . and citing the authorities relied on, *under headings that correspond with the assignments of error.*" (Emphasis added). Because the petitioner's brief flagrantly violates this Rule, the Court has struggled to comprehend and analyze the arguments that petitioner's counsel has made. While we have in this case and in past cases routinely deferred to the aspirations of Rule 1(b) ("to provide a complete, expeditious, and effective method of review in all cases"), where a petitioner's brief fails to comply with Rule 10, we encourage opposing counsel to bring this failure to the attention of the Clerk of the Court so that any breach of Rule 10 may be promptly remedied.

established a prima facie, triable case of intentional disability discrimination. Second, Mr. Woods argues that Jefferds engaged in disability discrimination when it refused to reject the doctor's physical examination report or otherwise create some form of reasonable accommodation.

We begin by outlining the law governing the parties' dispute. Mr. Woods brought his suit under the Human Rights Act ("the Act"), which prohibits an employer from discriminating against a person because of a disability. "[T]he law protects persons with impairments from being denied employment by virtue of an employer's hostility to those who are disabled or its stereotypical assumptions about their capabilities." *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996). The Human Rights Act protects a disabled individual's right to employment so long as that individual is capable, with reasonable accommodations, of completing the bona fide, essential functions of the job.

The Act, specifically W.Va. Code § 5-11-9(1) [2016][5], provides the following protections for disabled individuals:

---

[5] In 2016, the Legislature adopted or modified statutes to allow employers to grant preferences in hiring to veterans and disabled veterans. In doing so, the Legislature modified W.Va. Code § 5-11-9(1) to provide that an employer exercising such a preference does not violate the Act when the veteran "meets all of the knowledge, skills, and eligibility requirements of the job[.]" W.Va. Code § 5-11-9a [2016]. None of these 2016 changes influence Mr. Woods's cause of action. *See 2016 Acts of the Legislature*, ch. 105.

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . . [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled[.]

An employer "discriminate[s]" when it "exclude[s] from, or fail[s] or refuse[s] to extend to, a person equal opportunities because of . . . [a] disability." W.Va. Code § 5-11-3(h) [1998]. The Act defines "disability," in part, as:

(1) A mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;

(2) A record of such impairment; or

(3) Being regarded as having such an impairment.

W.Va. Code § 5-11-3(m).

The parties' dispute also implicates regulations interpreting the Act promulgated by the West Virginia Human Rights Commission.[6] Specifically, the parties' arguments concern whether Mr. Woods is a "qualified individual with a disability," as defined by those regulations. The regulations provide that "[n]o employer shall, on the basis of disability, subject any *qualified individual with a disability* to discrimination in

---

[6] *See* W.Va. Code § 5-11-8(h) [1998] ("The commission is hereby authorized and empowered . . . [t]o do all other acts and deeds necessary and proper to carry out and accomplish effectively the objects, functions and services contemplated by the provisions of this article, including the promulgation of legislative rules[.]").

employment as it relates to . . . [h]iring[.]" W.Va. Code R. § 77-1-4.1.2 [1994] (emphasis added). The regulations go on to provide the following definition for "qualified individual with a disability:"

> 4.2. "Qualified Individual with a Disability" means an individual who is able and competent, *with reasonable accommodation*, to perform the *essential functions of the job*, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description may be considered evidence of the essential functions of the job. A job function may be considered essential for several reasons, including but not limited to the following:
>
> 4.2.1. The function may be essential because the reason the employment position exists is to perform that function;
>
> 4.2.2. The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> 4.2.3. The function may be essential because of the amount of time spent on the job performing the function.

W.Va. Code R. § 77-1-4.2 (emphasis added).[7] "A '[qualified individual with a disability]' under the West Virginia Human Rights Act and the accompanying regulations

---

[7] The regulations provide the following definition of "able and competent":

> 4.3. "Able and Competent" means that, with or without reasonable accommodation, an individual is currently capable of performing the work and can do the work without posing a direct threat . . . of injury to the health and safety of either other employees or the public.

W.Va. Code R. § 77-1-4.3. The regulations also provide the following definition of "reasonable accommodation":

Continued . . .

10

is one who is able and competent, *with reasonable accommodation*, to perform the essential functions of the job in question." Syl. Pt. 1, *Coffman v. W.Va. Bd. of Regents*, 182 W.Va. 73, 386 S.E.2d 1 (1988), *overruled on other grounds by* Syl. Pt. 4, *Skaggs*, 198 W.Va. at 59, 479 S.E.2d at 569. The parties' dispute, then, concerns whether Mr. Woods was a "qualified individual with a disability" who was able to perform the essential functions of the job with reasonable accommodation. We now turn to the means by which Mr. Woods was required to prove his case.

In general, a plaintiff may premise recovery under the Human Rights Act upon a theory of either disparate treatment or disparate impact. "Disparate treatment is applicable to claims of intentional discrimination, as opposed to claims that a facially neutral practice is having disparate impact upon a protected class." *West Virginia Univ./West Virginia Bd. of Regents v. Decker,* 191 W.Va. 567, 570-71, 447 S.E.2d 259, 262-63 (1994). Mr. Woods has based his case solely upon a claim of disparate treatment: he claims that Jefferds intentionally discriminated against him based upon his disability.

---

> 4.4. "Reasonable Accommodation" means reasonable modifications or adjustments to be determined on a case-by-case basis which are designed as attempts to enable an individual with a disability to be hired or to remain in the position for which he was hired. Reasonable accommodation requires that an employer make reasonable modifications or adjustments designed as attempts to enable an individual with a disability to remain in the position for which she/he was hired.

W.Va. Code R. § 77-1-4.4.

"An intentional discrimination case may be advanced in different ways. A plaintiff can prove discriminatory animus directly or by an inferential method of proof." *Skaggs*, 198 W.Va. at 71, 479 S.E.2d at 581. It is the rare case where there is evidence a defendant directly announces acting with a discriminatory intent. Most cases require the plaintiff to imply through circumstantial evidence that a defendant meant to improperly discriminate.[8] In those latter cases, the plaintiff relies on a shifting-burden-of-proof framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). "'The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence."'" *Skaggs*, 198 W.Va. at 71, 479 S.E.2d at 581 (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985), quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979)).

"The first step under *McDonnell Douglas* is to determine whether the plaintiff has made a prima facie case of discrimination." *Knotts v. Grafton City Hosp*., 237 W.Va. 169, 175, 786 S.E.2d 188, 194 (2016). We set out the general elements of a

---

[8] "Gone are the days (if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disabled or a member of a certain race or religion. To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that, once the plaintiff has shown the [*McDonnell Douglas*] elements, unlawful discrimination was the most likely reason for the adverse personnel action." *Skaggs*, 198 W.Va. at 72 n.21, 479 S.E.2d at 582 n.21 (quoting *Geraci v. Moody-Tottrup, Intern., Inc*., 82 F.3d 578, 581 (3rd Cir. 1996)).

prima facie case in Syllabus Point 3 of *Conaway v. Eastern Associated Coal Corp.*, 178

W.Va. 164, 358 S.E.2d 423 (1986):

> In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq.* (1979), the plaintiff must offer proof of the following:
>
> (1) That the plaintiff is a member of a protected class.
>
> (2) That the employer made an adverse decision concerning the plaintiff.
>
> (3) But for the plaintiff's protected status, the adverse decision would not have been made.

"The 'but for' test of discriminatory motive . . . is merely a threshold inquiry, requiring

only that a plaintiff show an inference of discrimination." Syl. Pt. 2, *Barefoot v. Sundale*

*Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995). "What is required of the plaintiff

is to show some evidence which would sufficiently link the employer's decision and the

plaintiff's status as a member of a protected class so as to give rise to an inference that

the employment decision was based on an illegal discriminatory criterion." *Conaway*,

178 W.Va. at 170-71, 358 S.E.2d at 429-30.

In the context of an employment-related disability discrimination claim

under the Act, this Court has adjusted the elements of a prima facie case to account for

the regulations propounded by the Human Rights Commission. As noted earlier,

individuals alleging disability discrimination in the employment context must not only

show they have a "disability," as defined by the Act, but must also show that they are a

"qualified individual with a disability," as defined in the regulations. This Court has

held:

> In order to establish a case of discriminatory discharge under *W.Va. Code,* 5-11-9 [1989], with regard to employment because of a [disability], the complainant must prove as a prima facie case that (1) he or she meets the definition of [having a "disability"], (2) he or she is a "[qualified individual with a disability]," and (3) he or she was discharged from his or her job. The burden then shifts to the employer to rebut the complainant's prima facie case by presenting a legitimate nondiscriminatory reason for such person's discharge. If the employer meets this burden, the complainant must prove by a preponderance of the evidence that the employer's proffered reason was not a legitimate reason but a pretext for the discharge.

Syl. Pt. 2, *Morris Mem'l Convalescent Nursing Home, Inc. v. W.Va. Human Rights*

*Comm'n*, 189 W.Va. 314, 431 S.E.2d 353 (1993).[9] Hence, to state a prima facie claim

under the *Morris Memorial* framework, a plaintiff alleging disability discrimination in the

employment context must (in part) show he or she is a qualified individual with a

disability and is "able and competent, with reasonable accommodation, to perform the

---

[9] Early iterations of the Human Rights Act used the term "handicapped." Since 1998, the Act has employed variants of the broader term "disability." *See 1998 Acts of the Legislature*, ch. 178. *See e.g.* Syl. Pt. 2, *Ranger Fuel Corp. v. W.Va. Human Rights Comm'n*, 180 W.Va. 260, 376 S.E.2d 154 (1988) ("A handicapped person claiming employment discrimination under *W.Va. Code*, 5-11-9 [1981], must prove as a *prima facie* case that such a person (1) meets the definition of "handicapped," (2) possesses the skills to do the desired job with reasonable accommodations and (3) applied for and was rejected for the desired job. The burden then shifts to the employer to rebut the claimant's *prima facie* case by presenting a legitimate, nondiscriminatory reason for such person's rejection. An example of such a legitimate, nondiscriminatory reason is that a person's handicap creates a reasonable probability of a materially enhanced risk of substantial harm to the handicapped person or others.").

essential functions of the job[.]" W.Va. Code R. § 77-1-4.2. "The plaintiff bears the burden of proving that he is qualified." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 892 (9th Cir. 2001) (discussing the term "qualified individual with a disability" under the Americans with Disabilities Act ("ADA")).

Once the plaintiff makes a prima facie case, "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the negative action taken against the complainant. The complainant then must prove that the employer's reason was pretextual." *Kanawha Valley Reg'l Transp. Auth. v. W.Va. Human Rights Comm'n*, 181 W.Va. 675, 677, 383 S.E.2d 857, 859 (1989). To demonstrate pretext, a plaintiff must demonstrate that "the employer did not act as it did because of its offered explanation." *Skaggs*, 198 W.Va. at 74, 479 S.E.2d at 584.

In summary, to establish a genuine issue of material fact for trial, Mr. Woods was required to show that (1) he met the definition of "disabled" under W.Va. Code § 5-11-3(m); (2) he was a "qualified individual with a disability," as defined in W.Va. Code R. § 77-1-4.2; and (3) despite being qualified, he was not hired by Jefferds on account of his disability.

Jefferds concedes the first element, that Mr. Woods has an actual "disability" as defined in the Act. The parties' arguments center on the second element: whether he was a "qualified individual with a disability" who was able and competent, with reasonable accommodation, to perform the essential functions of the job.

15

The parties agree that crouching and climbing ladders are bona fide, essential functions of the engineering equipment mechanic job. When the Jefferds employees made their decision not to hire Mr. Woods, the employees were reviewing a physician's report saying that Mr. Woods could not complete these two essential tasks. The physician's report, viewed from the reasonable perspective of the employer, showed the plaintiff could not perform the essential functions of the job.[10] Jefferds contends that, viewed objectively from the perspective of Jefferds, Mr. Woods has failed to make a prima facie case because he did not show he was qualified for the job.

Mr. Woods, however, appears to contend that he could have been a qualified individual if Jefferds had offered him some reasonable accommodation to address his disability. Counsel for Mr. Woods has never suggested what that accommodation might be, either before the circuit court or before this Court. Counsel for Mr. Woods simply argues that, when confronted with the physician's report, Jefferds should have researched and identified an accommodation that would have permitted him to do the job. Mr. Woods cites to Syllabus Point 2 of *Skaggs* where we outlined the proof required to show that an employer has failed to provide a prospective employee with a reasonable accommodation:

> To state a claim for breach of the duty of reasonable accommodation under the West Virginia Human Rights Act, W.Va. Code, 5-11-9 (1992), a plaintiff must alleged the

---

[10] Jefferds also contends that the physician's report establishes a legitimate, nondiscriminatory reason for not hiring Mr. Woods. We do not reach this argument.

following elements: (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) *a reasonable accommodation existed that met the plaintiff's needs*; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

Syl. Pt. 2, *Skaggs*, 198 W.Va. at 58, 479 S.E.2d at 568 (emphasis added). We said in *Skaggs* that in applying these factors, "[a]s with all our employment discrimination doctrines, flexibility and common sense must guide decisionmaking." *Id*. at 65 n.11, 479 S.E.2d at 575 n.11. Moreover, "Our law does not require an employer to wear blinders at the preaccommodation stage but contemplates an interactive process beneficial to both an employer and employee." *Id*. at 68 n.15, 479 S.E.2d at 578 n.15.

The record shows that Mr. Woods asked Jefferds for and received two accommodations for his disability: a dolly to move heavy objects, and a tennis shoe rather than a steel-toed shoe for his prosthetic leg. However, when confronted with the physician's report that he could not safely do tasks essential to the job, the record clearly establishes that Mr. Woods did not request or identify necessary additional accommodations. Despite the physician's statement that Mr. Woods could not safely crouch or climb ladders, Mr. Woods vociferously argued to the Jefferds employees that he could do these tasks and that the physician was wrong. That remains Mr. Woods's implicit argument on appeal, that it was unreasonable for Jefferds to rely upon the physician's report. We disagree.

17

Courts that have examined cases similar to the one at bar have repeatedly found that, at the time an employer weighs whether an individual can perform an essential task of the job, the employer may rely upon the reasonable opinion of a medical expert who has knowledge of the individual's condition and the essential functions of the job. The prevailing view "is that an employer's fitness for duty determination will be upheld – if reasonable – based on available information and the reasonable opinion of a physician familiar with the employee's work and medical history, and with the functional requirements of the job sought." John J. Coleman, III, *Disability Discrimination in Employment*, § 4:3 (2003).[11]

---

[11] *See, e.g., Deeds v. City of Marion*, 914 N.W.2d 330, 340 (Iowa 2018) ("Employers generally are entitled to rely on a physician's opinion that the employee or prospective employee is medically unqualified for the job."); *Otto v. City of Victoria*, 685 F.3d 755, 758 (8th Cir. 2012) (Employee's physician declared employee could not perform essential tasks of the job. "While it is true that Otto [the employee] told the city council that he could still perform these functions, his assertion was undermined by his own physician's determination that Otto's disability permanently restricts his ability to work."); *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006) ("If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability."); *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003) (the employer "was entitled to rely and act upon the written advice from [the employee's] physician . . . . In this situation, the employee's belief or opinion that she can do the function is simply irrelevant. The [Americans with Disabilities Act] does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden."); *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 443 (6th Cir. 1991) ("What is relevant is that [the employer], in fact, acted on its good faith belief about plaintiff's condition based on Dr. Paine's opinion, and, as the district court pointed out, there is no proof to the contrary. . . . In the present case, the district court found that [the employer's] medical staff reasonably relied upon the medical report of plaintiff's private psychiatrist and reasonably interpreted its contents."); *Indiana Civil Rights Comm'n v. S. Indiana Gas & Elec. Co.*, 553 N.E.2d 840, 843 (Ind. 1990) ("[I]f a physical examination

Continued . . .

For example, in *Action Industries, Inc. v. Pennsylvania Human Relations Commission*, 518 A.2d 610 (Pa. Cmwlth. Ct. 1986), a Pennsylvania employer refused to hire an individual for a warehouse job that involved heavy lifting based on a medical expert's opinion that, because of a spinal condition, the individual should not do heavy lifting. The individual filed a complaint alleging discrimination and, intending to show that the employer's reliance upon the medical expert was a pretext, filed two newly-created reports contradicting the employer's medical expert. The Pennsylvania court rejected the contradictory reports (generated long after the employer made its refusal-to-hire decision) and focused its analysis upon the employer's perception when it received the medical expert's report:

> Central to establishing discriminatory intent is the mind-set of the employer at the time of its alleged discriminatory conduct. Thus, the fact that, subsequent to the applicant's rejection certain facts of which the employer was previously unaware come to light, cannot operate to create retroactively an intent to discriminate. We therefore believe that in cases of disparate treatment based upon handicap or disability, an employer can have a good-faith defense which negates its intent to discriminate where it *reasonably* relies upon the opinion of a medical expert in refusing to hire an applicant.

engenders a qualified expert's opinion an applicant for employment is physically unfit to perform the work required and the employer in good faith refuses to hire the applicant for that reason, the employer has a good defense to a later action, even though the initial expert's opinion is later proven wrong."); *Unified School Dist. No. 259 v. Kansas Comm'n on Civil Rights*, 640 P.2d 1291, 1294 (Kan.Ct.App. 1982) ("No contention is made that the school district acted in bad faith. The school district refused to employ Palmer as the result of independent medical advice given to it that Palmer should not be hired because of an existing medical problem that was job related.").

19

This is not to say that in cases involving handicap discrimination an employer can always insulate itself by having a physician "sign off" on all hiring decisions. A complainant could still show, for example, that reliance upon the doctor's opinion was unreasonable under the circumstances, that the employer paid the doctor only if a prospective employee was found to be unsuitable, or that an employer advised the doctor to declare all blacks, women, etc. "unfit." In these situations intent to discriminate could legally exist. . . . [I]t is virtually certain that, except in the most extreme cases, contradictory medical opinions will exist. The fact that a complainant can find a doctor to contradict the opinion of an employer's doctor, which the employer reasonably relied upon in good faith, should not give rise to liability, nor do we believe that the Act intended such a result.

*Action Indus.*, 518 A.2d at 613 (citations omitted). *See also*, *Crocker v. Runyon*, 207 F.3d 314, 317 (6th Cir. 2000) (affirming summary judgment dismissing disability discrimination claim because the plaintiff, who failed two pre-employment physical exams, "failed to offer medical evidence contemporaneous with his nonhiring to contradict the evidence upon which the [employer] relied.").

Even this Court has discussed allowing an employer to rely upon a physician's report, albeit in the narrow context of an employee's disability (epilepsy) that supposedly threatened harm to the employee and others. We said in Syllabus Point 3 of *Davidson v. Shoney's Big Boy Restaurant*, 181 W.Va. 65, 380 S.E.2d 232 (1989), "[a]s a general rule, to satisfy the standard of a serious threat to one's health or safety, the employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm." We tempered this rule with the following caveat: "[T]he employer's judgment must be individualized 'based on a consideration of

20

the job requirement in light of the [individual's] handicap, and the [individual's] work and medical history,' rather than 'on general assumptions or stereotypes about persons with that particular handicap.'" *Davidson*, 181 W.Va. at 70, 380 S.E.2d at 237 (quoting *Ranger Fuel*, 180 W.Va. at 266, 376 S.E.2d at 160).

We decline to impose a duty on employers to second-guess a reasonable, independent medical opinion that an employee, or prospective employee, is not physically qualified for a position. When an employer makes a job-related decision about an employee or a prospective employee, the employer can and should rely on all evidence contemporaneously available to make a fair and proper decision. The arguments posed by Mr. Woods essentially demand that employers wear blinders and ignore the reasonable, good faith assessments of a medical expert. We reject this approach, and hold that under the Human Rights Act, an employer may rely upon the reasonable opinion of a medical expert when deciding if a disabled individual is medically qualified to perform the essential functions of a job. A reasonable opinion is one made in good faith by an expert familiar with the individual, including the individual's work and medical history, and with the essential functional requirements of the job. An employer is entitled to rely and act upon the written advice from a physician that an employee cannot safely do a task.

In the instant case, we see nothing in the record to suggest that Jefferds relied upon any "illegal discriminatory criterion" when it chose not to hire Mr. Woods. *See Conaway*, 178 W.Va. at 170-71, 358 S.E.2d at 429-30. At the time when it made its

21

employment decision, Jefferds relied upon the report of a physician who had examined Mr. Woods and had assessed his abilities, in light of the functional requirements of the engineering equipment mechanic job. Mr. Woods was required to show, at the time he sought employment, that he was physically qualified to perform the essential functions of the job. The physician determined that Mr. Woods was medically unqualified for the job, and on this record Jefferds could reasonably rely upon that opinion.

Moreover, to meet the definition of a "qualified individual with a disability," Mr. Woods needed to offer some triable proof that he was able and competent, "*with reasonable accommodation*, to perform the essential functions of the job." W.Va. Code. R. § 77-1-4.2 (emphasis added). To establish that Jefferds breached its duty to provide a reasonable accommodation, Mr. Woods was required to show, among other things, that "a reasonable accommodation existed that met the plaintiff's needs[.]" Syl. Pt. 2, *Skaggs*, 198 W.Va. at 51, 479 S.E.2d at 561. Mr. Woods refused to discuss, and specifically refused to identify, any necessary accommodations in addition to those accommodations previously agreed to.

In this case, Mr. Woods sought two accommodations during interviews with Jefferds, and the parties agreed to both of those accommodations. With regard to the physician's report that Mr. Woods could not safely squat or climb ladders, Mr. Woods made no reasonable and specific requests for accommodation. Moreover, we see no evidence in the record that either party was aware, then or now, of a reasonable accommodation that could meet Mr. Woods's needs. In other words, because we see no

22

genuine issue of material fact in the record to suggest that a reasonable accommodation existed, Mr. Woods did not establish his claim that Jefferds failed to reasonably accommodate his disability.[12]

## IV. Conclusion

Mr. Woods failed to establish a prima facie case of intentional disability discrimination. The employer, Jefferds, was entitled to rely upon the reasonable physician's report indicating that Mr. Woods could not perform essential tasks of the job because of his disability, and Mr. Woods failed to show that any reasonable accommodations were demanded or even existed. Accordingly, the circuit court's October 4, 2017, order correctly granted summary judgment to Jefferds.

Affirmed.

---

[12] Plaintiff Woods also appeals a circuit court ruling limiting the damages that a jury could award in his case. Because we find that the record supports the circuit court's summary judgment finding that the plaintiff failed to establish a triable issue regarding his claim of intentional discrimination, we decline to address the arguments of the parties regarding damages.